PHILBROOK, Plaintiff in error, vs. THE STATE, Defendant in error.

*September 14—October 9, 1934.*

For the plaintiff in error there was a brief by *Cadigan & Cadigan* of Superior, and oral argument by *Peter B. Cadigan.*

For the defendant in error there was a brief by the *Attorney General, Herbert H. Naujoks,* assistant attorney general, and *Claude F. Cooper,* district attorney of Douglas county, and oral argument by *Mr. Naujoks* and *Mr. Cooper.*

WICKHEM, J.   The first contention to which our attention is directed is that the evidence does not sustain the verdict.   This requires a consideration of the facts in some detail.   At the time of the occurrences hereafter related, defendant was superintendent of the Douglas county work farm.   He had held this position for more than twenty-five years.   As superintendent it was his duty to supervise the farm and to perform duties analogous to those of a warden with respect to prisoners committed to the institution.   On June 25, 1933, Andrew Morman was a "trusty" at the work farm.   He slept in the basement of the building and not with the other prisoners in the dormitory or "bull pen."   On this day defendant left the work farm early in the morning and spent the day playing golf.   He returned home about 9 o'clock in the evening.   Sometime during the afternoon of this day Andrew Morman secured some liquor and invited two other prisoners, Johnny Thompson and Andrew Anderson, to help him consume it.   The three prisoners proceeded to become very intoxicated.   During the afternoon Anderson and Morman attempted to get away from the work farm, but were brought back by the guards, each being caught separately.   Morman was the first to be returned to the work farm, and after the guard had brought him back and while he was looking for Thompson, Morman again attempted to escape.   One of the other guards then brought him back. By that time Morman was badly intoxicated and it was somewhat difficult to control him.   The guard attempted to take him to his sleeping quarters in the basement.   During the process of getting him down the fifteen steps leading from the first floor, Morman pulled away from the guard

and fell down the concrete steps, lighting on his right shoulder and head. The guard then got Morman to his feet and brought him upstairs to the dormitory. There were several disturbances during the afternoon, due to the intoxication of the three prisoners, and as a result dinner that evening was served in the cells and dormitory. After defendant arrived home, and just before he retired, there was a commotion in the dormitory, and defendant decided to put Morman in solitary confinement. The room used for purposes of solitary confinement adjoined the dormitory, and contained a block of two cells. At the time, two prisoners, Francis Polk and Einar Johnson, occupied these cells, and defendant ordered a guard to remove Johnson to the dormitory and to call Morman out of the dormitory. Morman did not reply to the guard, and defendant called to Morman to come out. There is some dispute as to what Morman said, but the reply was not satisfactory to defendant and he went into the dormitory. When he came in, there is evidence on the part of the defense that Morman refused to come, and evidence on the part of the state that he was in the process of getting his clothes on so that he might obey the order. At any rate it is not disputed that defendant first slapped and then struck Morman. There is sharp dispute as to the extent and circumstances of this beating, but the state's witnesses testified that defendant struck Morman between fifteen and thirty times; that these were hard blows; that as a result Morman was ultimately knocked down upon a cot, and struck several hard blows that drove the back of his head against a radiator. After this occurrence defendant took Morman to the solitary cell. The guard evidently neglected to lock the door of the solitary cell, and before defendant had gone any considerable distance Morman was out of the cell. Defendant returned, put Morman back in the cell and locked it. Defendant claims that on this occasion he merely took Morman by the shoulder, shoved him into the

cell, and pushed him onto the bed. There is some confusion in the testimony as to whether defendant returned to Morman's cell once or twice. The testimony of Polk, who occupied the other cell, is to the effect that defendant returned on one occasion immediately after leaving Morman, and on another occasion because Morman was making some sort of threat to appeal to the state board of control. Polk testified that on each occasion there was a commotion and the sound of blows. Shortly after defendant went downstairs, Morman asked Polk for a cigarette, and Polk tried to give him one through the cell bars (the two cells adjoined each other). He was unsuccessful. At this time Morman was evidently on the floor of his cell. Polk also testified, "Once it seemed to me that I heard Andy Morman fall." In the morning Morman was discovered on the floor of the cell, dead.

The medical testimony is not in dispute as to the cause of death. There was no skull fracture. There was a hematoma, which is a bruise or collection of blood underneath the skin, back of the left ear, and another to the left and just below the external occipital protuberance. These bruises were from two to three inches apart. There were large areas of hemorrhage over the upper portions of the cortex, or both cerebral hemispheres. There was hemorrhage into the left occipital lobe, with laceration of the brain substance in that area. The location of this lacerated area was between the bruises or hematomas described. While the medical opinion was that the intoxication of Morman could have accelerated his death, it was agreed that the laceration of the brain substance was the cause of death. All of the medical experts except one agree that this condition was probably caused by the force or injury that produced the hematomas.

From the foregoing it may be concluded that the following facts are either undisputed or clearly supported by the evidence: Morman died as the result of a violently produced laceration of the brain. Defendant was guilty of acts of

violence directed to Morman's person, capable of producing the fatal result. The only basis for a claim that the evidence does not sustain the verdict is that at least two other events during the afternoon and evening were capable of producing Morman's injuries and death, and that the selection of any one of them as the cause of death could only be by speculation, conjecture, or guess. The first circumstance is the fall downstairs. It was the opinion of medical experts that so far as the degree of physical force involved or necessary to produce the results, this fall was capable of producing fatal injuries. There was also medical opinion to the effect that the fatal termination of such injuries could be deferred as long as twenty-four hours.

The next circumstance is the fall which Polk testified to. Assuming that Morman on this occasion fell out of bed some two and one-half feet, and struck the back of his head on the concrete cell floor, the medical opinion was that this fall was capable of producing the injuries. Finally, there were the blows inflicted upon Morman by defendant. Is there any evidence, or are there any inferences to support the jury's conclusion that it was the conduct of defendant and not the other two accidents that produced death? The fall downstairs may well have been eliminated by the jury upon two grounds: First, the evidence of the guard was very definite that Morman fell and struck his right shoulder and the right side of his head. Accepting this testimony, the likelihood of the fall producing the hematomas is very slight, if, indeed, there is any possibility of a causal relation. Further than this, the jury were entitled to believe, from the severity of the lacerations and the resultant hematomas, that had the fall been the cause of death, fatal results, or at least greater evidence of mental deterioration, would have been manifested earlier in the evening. The medical experts called by the state testified that unconsciousness would occur as a result of the injury to the brain in from two to six

hours, and that intoxication would tend to accelerate the unconsciousness.

Polk's testimony as to the fall out of bed is extremely indefinite. What he heard was a sound as though Morman had fallen. He did not know whether he had fallen out of bed, or if he had, how he had struck. It should be pointed out that the fall out of bed could not account for two distinct bruises or hematomas. One of the medical experts called by the defense characterized this fall as a possible but not a probable cause of the injuries. On the other hand, there is an abundance of testimony to the fact that defendant struck Morman from fifteen to thirty times, and that several of these blows caused the back of Morman's head to be driven against a radiator. It is contended by defendant that this cannot account for the hematomas, which are produced by contact with a flat surface, because the surface of the radiator was such as to cause an incision or cut. However, the radiator is capable of producing just such an injury as is shown here, and the spacing of the two injuries might have been considered by the jury to indicate that each was produced by different sections of the radiator simultaneously.

It is our conclusion that the jury's verdict is supported by the evidence and is not based on conjecture or guess. Defendant relies upon *Kuhl v. State,* 167 Wis. 495, 167 N. W. 743. In that case defendant was charged with murder of his wife. The post-mortem showed injury to the left temporal muscle by violence, and on the opposite side of the skull a hemorrhage had taken place. There was evidence that she had been struck by a dehorned Holstein bull during the day, and that this would account for her condition. The only evidence connecting the defendant with her death was that of a witness, who testified that while he was some nine hundred feet from the house of the parties he heard a woman's scream, and then a man swearing, and that it sounded like defendant's voice. That was the only evidence that de-

fendant struck his wife. The court reversed a conviction and ordered a new trial, not because there was no evidence to sustain the jury's verdict, but because of misgivings that justice had miscarried,—misgivings that were measurably accentuated by the decision of the trial court in which he indicated his belief that upon the evidence defendant should not have been convicted. In the *Kuhl Case* the conclusion that defendant struck his wife was a rather remote inference from another inference, to wit, that they had been quarreling. In the instant case the jury's conclusion that defendant struck Morman with sufficient force to cause his death is overwhelmingly supported. The only ground upon which this court could reverse this conviction would be a feeling that the source of the injuries which operated to cause death was so nebulous and doubtful as to lead to the view that justice had probably miscarried. A careful examination of the record convinces us that such a view cannot validly be entertained. While a jury might reasonably have acquitted defendant, there is ample evidence to sustain the verdict, and it had the approval of an able and experienced trial judge.

It now becomes necessary to consider two further assignments of error. It is first contended that the court erred in allowing the district attorney, over defendant's objection, to read the testimony of Francis Polk, a witness who had testified for the state at a previous trial. The rule that the testimony of a witness at a former trial, whom the accused had the opportunity to confront and to cross-examine, may be read into evidence, is subject to the qualification that the witness must be unable to appear and testify because of physical or mental incapacity or absence from the jurisdiction. *Inda v. State,* 198 Wis. 557, 224 N. W. 733. In this case it was held that while the trial court has "a large discretion in reaching its conclusion" that the witness is without the reach of process, it must have sufficient facts before it to warrant this conclusion. These facts must consist of "positive evidence

of the absence of the witness from the state, or positive evidence that a thorough official search for the witness in the state has been made." It was further held that "such evidence should be definite and certain so that the court may see from the facts proven that further search would have been unavailing." In this case a deputy sheriff testified that he received two subpœnas for Francis Polk; that he was unable to serve Polk because he could not locate him; that he did not know whether Polk had a home in the city of Superior or not. He first attempted to serve a subpœna on Polk at the home of one Norman Larson, who was a fellow prisoner with Polk at the work farm, and to whose home he had understood Polk intended to go after his release. He made a number of inquiries, and nobody seemed to know Polk. After making several inquiries he concluded that Polk had left for the Pacific coast. He made no effort to communicate with the police authorities either on the Pacific coast or in the state of Wisconsin, and had instituted no investigation to locate Polk. One Berger testified that he knew Polk for a day or two before defendant was arrested, and had seen him four times, the last time being six or seven days after the first trial of this case. He then had some conversation with him and Polk said he was going to stay at the Larson farm for a while, and as soon as he could get some clothes he was going to the west coast. Berger told him that he ought to keep in touch with some one and let them know where he was. Polk said he was going to the west coast, and that after he got there he would send Berger a letter, letting him know what his address was. Outside of this Berger knew nothing of the whereabouts of Polk. One Walsh testified that he had known Polk, having met him three or four times in the office of his newspaper; that Polk declared his intention of leaving for the west coast as soon as he could get some heavier clothing. One Larson testified that he and Polk were re-

leased together from the county jail, and he had not seen Polk since that date.

We are of the opinion that the facts warranted the trial court's conclusion that Polk was without the jurisdiction. If the showing of the state had consisted solely of the testimony of the officer, there might be merit in the claim that due diligence was not established, but this testimony, together with that of Polk's intention to leave the state, the fact that he had not been seen by friends and acquaintances, and that he was a transient, support the conclusion that he carried his declared intention into effect. Under these circumstances we conclude that a sufficient basis for the admission of the evidence was laid, and that there was no prejudicial error.

It is next contended that the court erred in admitting, over the objection of defendant, evidence to the effect that two witnesses for the state, namely Larson and Polk, were allowed to escape from the work farm without showing that the defendant was in any way responsible for their escape. This assignment we consider to be without merit. Defendant was superintendent of the farm. Presumably acts done by the guards were done with his direction. The testimony of the prisoner Larson, in so far as he was permitted to testify by the court, was that he was taken out by a guard named Haffey and let go. This occurred on the 27th or 28th of June, a day or two after the death of Morman. The two prisoners, according to the testimony of the defendant himself, had never previously been out of the institution, and were not regarded as sufficiently trustworthy to be taken out to work on the farm. Defendant admitted that he outlined the work for the men every day. While he claimed that he did not instruct Haffey as to what prisoners to take out on the day in question, the fact that Haffey started out under his direction, and that upon this occasion, of all occasions, Haffey took out two men who could give most damaging

testimony against defendant, and who theretofore had never been permitted to go out of the building, presents a combination of circumstances which make permissible the inference that defendant had something to do with their escape. When there is added to this the fact that defendant admitted that he made no effort to secure the return of the prisoner, or to institute an investigation, we conclude that there was a sufficient showing of his connection with the escape to make the evidence competent.

The foregoing considerations compel the conclusion that there was no prejudicial error, and that the evidence warrants the conviction. The record, as well as the brief presented upon this appeal, evidences the fact that defendant had the benefit of resourceful and able counsel. The verdict has the approval of an exceptionally able and experienced trial judge. We discover no ground upon which the conviction can be disturbed.

*By the Court.*—Judgment affirmed.